<u>EXECUTION COPY</u>

## OPTION AGREEMENT

This Option Agreement (the "**Agreement**"), dated as of ~~June 13~~, July 13th, 2015, by and between **Union Carbide Corporation**, a New York corporation, with offices at 1254 Enclave Parkway, Houston, Texas 77077 ("**Grantor**"), and **Camden County,** a political subdivision of the State of Georgia, by and through the Camden County Board of Commissioners, with offices at 200 East 4th Street, Woodbine, GA 31569 ("**Grantee**").

## WITNESSETH:

**WHEREAS**, Grantor is the owner of those certain tracts or parcels of real property located in Woodbine, an unincorporated area in the County of Camden, State of Georgia, containing about 4011.54 acres, more or less (the "**Site**"), as shown on the drawing, map, or survey plat in **Exhibit A-1,** and as more fully described by metes and bounds in **Exhibit A-2**, both such Exhibits being attached hereto, incorporated herein, and hereby made a part hereof; and

**WHEREAS**, the Site is subject to that certain Hazardous Waste Facility Permit No. HW-063(D) (the "**Permit**") issued by the Environmental Protection Division, Department of Natural Resources, State of Georgia ("**GA DNR**"); and

**WHEREAS**, the Site contains various closed Solid Waste Management Units (the "**SWMUs**"), areas of surface and subsurface munitions from a prior owner (Munitions Response Areas, or the "**MRAs**," also identified in some reports as "Munitions and Explosives of Concern Areas" or "MEC Areas"), and a closed hazardous waste Landfill (the "**Landfill**"), the locations of which have been previously disclosed to Grantee by Grantor through Grantor's Reports, and also appear in Grantee's Due Diligence Study and Phase I ESA pursuant to the Preliminary Agreement (as those terms are respectively defined herein below); and

**WHEREAS**, the Landfill cell comprises about 32.97 acres, more or less, is the subject of that certain Affidavit Disclosure Certificate dated January 26, 2011 and filed of public record with the Camden County Clerk's Office in Book 1556 at Page 00092, and receives ongoing post-closure care and corrective action by Grantor pursuant to the Permit; and

**WHEREAS**, Grantor's groundwater treatment system, including pipes, sparging equipment, and monitoring wells associated with the Landfill, comprises about 58.16 acres, more or less (collectively, the "**Treatment System**") and is located under and adjacent to the Landfill in a buffer area which, together with the Landfill, comprises an aggregate area of about 80.72 acres, more or less, (collectively, the "**Retained Land**"); and

1

WHEREAS, Grantor intends to subdivide the Site in order to exclude the Retained Land  from any sale of the remainder of the Site (the "**Subdivision**"), such remainder, exclusive of the Retained Land, to comprise about 3930.82  acres, more or less (the "**Property**"); and

WHEREAS, the Property includes about 2813 acres, more or less, of salt marsh; and

WHEREAS, the Property also includes an additional area of about 137 acres, more or less, of delineated freshwater wetlands within a larger area of about 647 acres, more or less, that is the subject of a Preliminary Jurisdictional Determination and an Expanded Preliminary Jurisdictional Determination, both dated May 13, 2011 by the Department of the Army, US Army Corps of Engineers; and

WHEREAS, the Property also includes an additional area of freshwater wetlands that has not yet been delineated and that appears on the United States Fish and Wildlife Service National Wetlands Inventory map; and

WHEREAS, all accurate acreages and final metes and bounds descriptions are to be finally determined by the Title Survey and Title Report; and

WHEREAS, any deed of sale (the "**Deed of Sale**") of the Property to be given at any Closing (as hereinafter defined) by Grantor to Grantee or its permitted assignee will reserve access rights, as necessary in Grantor's reasonable judgment, and subject to Grantee's reasonable restrictions given the intended future uses of the Property, to allow for Grantor's access to, from, and through the Property in order to approach, exit, operate, maintain, repair, and/or replace the Treatment System and the Retained Land, and to implement and/or maintain institutional and/or engineering controls on the Treatment System and the Landfill and on the SWMUs and the MRAs, and to complete additional remediation in respect of all or any of the foregoing in the event the same may be required pursuant to GA DNR or US EPA rulings or regulations; and

WHEREAS, GA DNR or US EPA may require the execution and filing by Grantor prior to, or by Grantee subsequent to, any Closing (as hereinafter defined) of a deed notice imposing additional restrictions in the form of institutional and/or engineering controls, a site management plan, or otherwise (the "**Deed Notice**"); and

WHEREAS, any such Deed Notice to be placed on the Property shall be subject to the reasonable review and consultation of Grantee so as to be reasonably compatible with Grantee's intended future use of the Property; and

WHEREAS, prior to or at the Closing (as hereinafter defined) on the sale of the Property pursuant to this Agreement, Grantor reserves the right, but

will not be obligated, to burden the Property with a conservation easement in favor of Grantor's preferred conservation organization, the terms of which will be negotiated with such organization by Grantor and Grantee diligently in a cooperative manner and in good faith so as to (i) further restrict the use of, and impose performance standards upon, the Property for conservation purposes such that the Property will fully qualify and conform to the requirements and procedures defined in Internal Revenue Code Section 170(h) for the benefit of Grantor, but at the same time (ii) allow for access to and from the Property, and construction, operation, maintenance, and repair of the Spaceport Project in the Spaceport Area on the Property for the benefit of Grantee and its successors and permitted assigns (as those terms are respectively herein defined) (the "**Conservation Easement**"); and

WHEREAS, Grantor is willing to grant, and Grantee desires to accept, the option to purchase the Property upon the terms and subject to the conditions hereinafter set forth (the "**Option**"), for the purpose of developing a spaceport project, including proposed Launch Areas, Landing Areas, a Control Area, and ancillary facilities (collectively, the "**Spaceport Project**") on a combined footprint of about 400 acres, more or less, of the Property, plus a buffer zone, all as shown in more detail on that certain conceptual site map, and described by metes and bounds, in **Exhibits B-1** and **B-2**, respectively, attached hereto, incorporated herein, and hereby made a part hereof (collectively, the "**Spaceport Area'**"), subject to approval of the United States Federal Aviation Administration (the "**FAA**") as to concept, including access roads thereto and therefrom, and consistent with the Conservation Easement as to signage and performance standards related thereto; and

WHEREAS, Grantee has heretofore entered into that certain Memorandum of Understanding with the FAA, duly executed by the FAA on May 22, 2013 and by Grantee on May 28, 2013 (the "**FAA MOU**"), a true copy of which is attached hereto as **Exhibit C**, incorporated herein, and hereby made a part hereof; and

WHEREAS, the FAA MOU provides, *inter alia*, that an Environmental Impact Statement, as defined therein (the "**EIS**"), will be necessary in order for Grantee to obtain FAA approval of the Spaceport Project; and

WHEREAS, the parties have heretofore entered into that certain undated Agreement Regarding Potential Real Estate Transaction in respect of the Property, executed by Grantor on September 11, 2012 and by Grantee on November 16, 2012 (the "**Preliminary Agreement**"), a true copy of which is attached hereto as **Exhibit D**, incorporated herein, and hereby made a part hereof; and

WHEREAS, pursuant to the Preliminary Agreement and as defined therein, Grantor has heretofore furnished to Grantee copies of certain

3

environmental **Reports** (a list of such reports being contained in **Exhibit E** hereto), including but not limited to the Permit, regarding the condition of the Property, and Grantee currently continues to conduct a **Due Diligence Study** of the Property, including but not limited to, the EIS and a Phase I Environmental Site Assessment thereof (the "**Phase I ESA**");

WHEREAS, Grantor is willing to furnish additional copies of Reports in its possession as reasonably requested by Grantee on a confidential basis, which Grantee is willing to honor; and

WHEREAS, Grantor received a letter (the "**Technical Review Letter**") dated March 25, 2015, from GA DNR, a true copy of which is attached hereto as **Exhibit F**, raising a number of technical issues relating to the SWMUs and the MRAs on the Site, and the parties intend to work cooperatively together to address such issues to GA DNR's satisfaction.

NOW THEREFORE, in consideration hereof and the mutual covenants and agreements herein contained, Grantee and Grantor hereby agree as follows:

1. <u>GRANT AND ACCEPTANCE OF OPTION:</u>

Subject to the terms and conditions of this Agreement and on the basis of the representations, warranties and covenants herein contained, Grantor hereby agrees to grant to Grantee, and Grantee hereby agrees to accept from Grantor, the option to purchase the Property as herein contained (the "**Option**").

2. <u>OPTION PRICE/ PAYMENT / EXERCISE:</u>

A.   **Option Period.**

The duration of the Option shall commence on the date first written above, and, unless sooner terminated by Grantee or otherwise by the terms hereof, shall continue through and including the date that is two (2) calendar years thereafter (the "**Option Period**"), and shall expire the immediately following day, automatically and without need for notice by either party to the other; provided, however, that, at any time during the ninety (90) days immediately preceeding such expiration date, Grantee may extend the Option Period for one additional year on the same terms and conditions of the Option Period as provided herein (the "**Extension Period**") by (i) giving written notice thereof to Grantor and (ii) paying Grantor the additional amount of Seven Hundred Twenty Thousand Dollars and No Cents ($720,000.00) in the same manner as its payment of the Option Price (as defined below and provided for herein) plus the amount of Grantor's real property taxes on the Property that would have been otherwise incurred during the Extension Period prior to its expiration or earlier exercise of the Option by Grantee

(collectively, the "**Extension Period Price**") (the Option Period and the Extension Period being hereinafter referred to collectively as the Option Period).

### B.   Option Price.

The price of the Option shall be Nine Hundred Sixty Thousand Dollars and No Cents ($960,000.00), plus the amount of Grantor's real property taxes on the Property that would have been otherwise incurred during the Option Period prior to its expiration or earlier exercise of the Option by Grantee (collectively, the "**Option Price**");

### C.   Payment.

(i)   The amount of $960,000.00 aforesaid of the Option Price, shall be paid in a single lump sum upon execution of this Agreement, by wire transfer from Grantee to Grantor's account number to be furnished, without going to or through Escrow Agent (as defined below) and the amounts of Grantor's real property taxes aforesaid shall be waived or rebated by the County at its election.

(ii)   The additional amount of $720,000.00 aforesaid of the Extension Period Price shall be paid in a single lump sum upon Grantee giving notice to extend the Option Period as aforesaid in Section 2(A) above by wire transfer in the same manner as aforesaid in Paragraph 2(C)(i) above, and the amounts of Grantor's real property taxes for the Extension Period shall be waived or rebated by the County at its election.

### D.   Refundability/Non-Refundability.

(i)   Upon receipt by Grantor, the Option Price and the Extension Period Price, if any, shall be non-refundable to Grantee under any circumstances, except as may be expressly so provided below in this Agreement;

(ii)   The Option Price shall be refundable only if the Grantor is unsuccessful in (a) substantially resolving the concerns raised in the Technical Review Letter either (i) to GA DNR's satisfaction by the end of the Option Period, or (ii) otherwise by agreement of the parties, or (b) subdividing the Retained Land, provided that (i) Grantee shall have made reasonable commercial efforts in good faith at all levels of government to assure cooperation of local and state agencies in support of Grantor's efforts to obtain such resolution of GA DNR concerns, and to obtain such subdivision, all as aforesaid, and (ii) Grantee is successful in obtaining FAA approval for the EIS; and

(iii)   The Option Price shall be available as a credit against the Purchase Price of the Property to be taken at Closing hereunder, except if Grantee has elected to extend the Option Period into the Option Extension Period, in which

event solely the Extension Period Price shall be available as a credit against the Purchase Price of the Property to be taken at Closing hereunder.

### E.   Exercise.

The Option may be exercised by Grantee at any time prior to expiration of the Option Period by Grantee giving written notice to Grantor of Grantee's commitment to purchase the Property upon the terms and conditions set forth in this Agreement. The parties shall proceed diligently in a cooperative manner and in good faith to close on the transaction within not more than 90 days from and after such notice is received by Grantor, or such other date as the parties may mutually agree in writing (the "**Closing**").

### 3.   PURCHASE AND SALE OF PROPERTY

In addition to all other applicable terms and conditions set forth in this Agreement, the terms of purchase and sale of the Property upon exercise of the Option by the County shall be as follows:

### A.   Purchase Price.

The purchase price of the Property shall be Four Million Eight Hundred Thousand Dollars and No Cents ($4,800,000.00) (the "**Purchase Price**"), which, as adjusted pursuant to this Agreement as provided below, including but not limited to credit for the amount of the paid Option Price as provided above, shall be paid by Grantee by wire transfer into an escrow account to be designated by Escrow Agent prior to Closing. At Closing, Escrow Agent shall disburse funds pursuant to a settlement statement that it has prepared and is mutually agreeable to Grantor and Grantee.

### B.   Deed of Sale.

The Deed of Sale shall be a Limited Warranty Deed sufficient to convey all of Grantor's right, title, and interest in the Property to Grantee, with a warranty limited solely to Grantor's acts during its period of record ownership, executed and acknowledged on behalf of Grantor, and accepted on behalf of Grantee, in proper Georgia statutory form for recording, and which

**(i)**   is expressly subject to all matters of record, and

**(ii)**   is expressly subject to all conditions that an accurate survey may reveal, and

**(iii)**   contains restrictive covenants that run with the land in perpetuity for the benefit of Grantor and of Grantor's adjacent Retained Land, as follows:

6

(a)     to the extent an existing Environmental Covenant can be modified, as specified below, prohibiting the use of the groundwater from beneath the Property except for no more than 3 wells withdrawing groundwater from the Floridian aquifer (at least 800 feet below ground surface) and located hydrologically up-gradient from the Landfill, meaning more than 500 feet to the south or south east of the Landfill, or such other restrictions on location and depth of wells as may be agreed in writing by Grantor in its sole discretion, Grantee, and GA DNR prior to the Closing Date, and

(b)     prohibiting use of the Property for residential, school, pre-school, playground, day care, playing field, recreation, hotel, motel, cooperative, condominium, time-share, leisure, hospital, nursing home, assisted living, and rehabilitation facility, and any other use including an overnight residential component; and

(iv)   contains a reservation unto Grantor, its employees, agents, representatives, contractors, and consultants, and for those of GA DNR, and for those of the United State Environmental Protection Administration ("US EPA"), of a right of access, entry, egress and exit to, on, under, and from the Property as necessary in the discretion of Grantor, GA DNR, and/or US EPA, and subject to the reasonable rules and restrictions of Grantee, in order to sample, inspect, maintain, repair, remove, replace, install, and relocate monitoring wells, including but not limited to the monitoring wells existing on the Retained Land as of the Closing, on an as-needed basis, and to take such other actions, if any, on the Property as may be or become necessary or appropriate in compliance with the Permit, provided that any relocation or installation of a new well in a new location on the Property but outside of the Retained Land shall be performed by Grantor (i) after having obtained approval from the appropriate government agency when necessary, and (ii) in a manner that does not unreasonably interfere with Grantee's use of the Property, except that nothing in this subparagraph shall be construed to impair any legal authority of GA DNR or US EPA; and

(v)    is expressly subject to any existing institutional controls and/or engineering controls currently imposed on the Property, except that Grantor and Grantee agree during the Option Period to cooperate in good faith and to use all commercially reasonable efforts to seek authority from GA DNR to modify the existing Environmental Covenant at Book 1562, Page 00627, to authorize the use of groundwater as provided in Paragraph 3.B(iii)(x), above; and

(vi)   is expressly subject to any institutional controls and/or engineering controls that may be required as of the Closing Date by GA DNR and/or US EPA, provided that Grantee has been given a reasonable opportunity in advance to review and consult regarding the proposed institutional and/or engineering controls (and, to the extent that any institutional controls and/or engineering controls must be implemented post-Closing, the parties shall cooperate in the

implementation of those controls with a view that such controls are reasonably compatible with Grantee's intended future use of the Property); and

(vii) is expressly subject to any site management plan that may be required as of the Closing Date by GA DNR and/or US EPA, provided that Grantee has been given a reasonable opportunity in advance to review and consult regarding the proposed site management plan (and, to the extent that any site management plan must be implemented post-Closing, the parties shall cooperate in the implementation of that plan with a view that such plan is reasonably compatible with Grantee's intended future use of the Property); and

(viii) is expressly subject to the Conservation Easement, provided that Grantee has been given a reasonable opportunity to review and approve in writing the proposed Conservation Easement prior to the Closing Date.

### C.    Post-Closing Remediation.

From and after Closing, Grantor shall make reasonable efforts:

(i)    to complete the remediation required by the Permit, including with respect to currently known SWMUs on the Property, and to similarly remediate newly-discovered releases, areas of concern ("AOCs"), SWMUs, or other environmental conditions (if any) that must be reported to GA DNR under the Permit on the Property which arose from Grantor's activities prior to Closing hereunder, provided that Grantor shall not be required to conduct such remediation arising from development, operations, or activities of Grantee, its successors and permitted assigns, the Spaceport Operator, or other entity in privity with the County in purchasing, leasing, or using the Property, such as a developer, commercial airport, or other user;

(ii)    to address currently known MRAs on the Property to the satisfaction of GA DNR, and to similarly address newly-discovered MRAs (if any) that must be reported to GA DNR under the Permit, which arose substantially from the activities of the owner of the Property immediately prior to Grantor's ownership thereof; and

(iii)    to operate and maintain the Landfill and the Treatment System on the Retained Land.

### D.    Environmental Liability Allocation.

Prior to the time of the Closing hereunder, if any, Grantee will have conducted the Due Diligence Study and any additional investigation and due diligence evaluation of the Property deemed necessary by Grantee, and Grantee hereby assumes any and all liability connected therewith and hereby releases Grantor therefrom, except for (i) environmental clean-up liabilities arising from a

8

(5)     cleanup costs (other than Excluded Cleanup Costs) associated with previously unknown environmental conditions to the extent that such cleanup costs arise or result from a governmental order or mandate pursuant to environmental law; and

(6)     all associated defense expenses.

(e)     Grantee shall furnish a copy of such Environmental Insurance Policy to Grantor at or prior to Closing, bound, effective, and fully paid for by Grantee, at its sole cost and expense, and without reducing the Purchase Price.

(f)     the Environmental Insurance Policy shall identify Grantee as the named insured and shall list Grantor as an additional insured.

(ii)     Grantor shall reasonably cooperate with Grantee's efforts to obtain the Environmental Insurance Policy, including allowing Grantee to make the Reports available to proposed insurance underwriters on a confidential basis, together with such additional documents relating to the environmental condition of the Property as such insurance underwriters may reasonably request and as are then in the possession of Grantor.

(iii)     Grantee shall make copies of the proposed Environmental Insurance Policy available to Grantor sufficiently in advance of Closing to allow a reasonable opportunity for Grantor's review thereof and comment thereon, and for the proposed insurance underwriters to address such comments to the reasonable satisfaction of Grantor and of Grantee.

### F.     Additional Insured

In addition to the Environmental Insurance Policy provided for above, Grantee shall cause Grantor to be named as an Additional Insured under each policy of insurance that Grantee obtains for its own benefit in connection with the Spaceport Project, and shall also use its best commercial efforts to have Grantor named as an additional insured under any policy of insurance obtained by any Spaceport Operator in which Grantee is also named as an Additional Insured.

### G.     Adjustments at Closing.

(i)     Escrow Agent.

Escrow Agent (as defined below) shall act as settlement agent for both parties at Closing, and the Closing shall be conducted electronically. The Purchase Price, as adjusted, and all necessary fully executed documents shall be prepared by the parties and submitted in advance to Escrow Agent, to be held until disbursed at Closing. Escrow fees shall be paid by Grantor as to one-half and

Grantee as to one-half, provided that Grantee's share of such fees shall be capped at $ 25,000.00. In the event this Agreement is terminated for any reason prior to Closing, escrow fees (if any) shall be equally divided between Grantee and Grantor (subject to the cap on Grantee's share of the fees).

**(ii)** Property Taxes.

All taxes of whatever nature and kind which have become a lien on the Property and are due and payable as of the Closing Date shall be paid and discharged by Grantor. All special assessments of whatever nature and kind which have become a lien on the Property as of the Closing Date shall be paid and discharged by Grantor. Current real and personal property taxes and any special assessments shall be prorated based on the number of days in the tax period that occur on or before the effective date of this Agreement and the number of days in the tax period that occur after such date; Grantor shall be responsible for taxes and any special assessments up to and including the Closing Date.

**(iii)** Survey/Title Report.

Grantor shall pay the cost of the Survey and the Title Report.

**(iv)** Title Policy.

Grantee shall pay the cost of any policy of title insurance that it may desire to be effective at Closing.

**(v)** Transfer Tax.

Any documentary transfer tax required by law shall be borne by the parties equally.

**(vi)** Attorneys' Fees.

Grantor agrees to pay any legal fees of attorneys representing Grantor in the transaction covered by this Agreement, and Grantee agrees to pay the legal fees of the attorneys representing Grantee in the transaction covered by this Agreement.

**(vii)** Recordation.

Upon receipt of the Purchase Price, as adjusted, Escrow Agent shall first record the Conservation Easement for Grantor's account, and then record the Deed for Grantee's account.

**(viii)** Credit for Paid Option Price.

Grantee shall receive a credit against the Purchase Price at Closing in the amount of the paid Option Price or the Extension Period Price, as the case may be, as provided in Section 2(D)(iii) herein above.

**(ix)**   Miscellaneous.

Any other costs not specifically covered by this Agreement shall be borne in the same manner as is customary in Camden County, Georgia, in connection with the sale of real property of the type covered by this Agreement.

**4.   OPTION RIGHTS AND OBLIGATIONS OF GRANTEE:**

**A.   Throughout the Option Period, and at all times prior to Closing:**

**(i)**   Access and Due Diligence.

Grantee shall have a right of access to the Property at all reasonable times for any reasonable purposes, including the right to conduct additional environmental inspections and invasive testing, to conduct the EIS, and to access utilities. Grantee shall cause its Contractor(s) to enter into an Access Agreement assuming responsibility for itself and designated Grantee Parties (who may include Grantee, its designated agents, employees, consultants, contractors, and subcontractors), substantially in the form provided in **Exhibit G** hereto, in performing such additional inspection and investigation of the Property as necessary to prepare the EIS pursuant to the terms of the FAA MOU. Grantee shall pay for all costs associated with the due diligence activities. Grantee shall, in a timely manner, pay in full the cost of all inspections, investigations, and inquiries of any kind conducted, so that no person or entity shall have the right to file any lien against the Property. In the event any lien is filed, Grantee shall promptly satisfy or bond that lien off the Property;

**(ii)**   EIS Information.

Grantee shall furnish Grantor in a timely manner with copies of all information and documents from any source generated by, or in any way connected with, the investigation for, and preparation of, the EIS, and make commercially reasonable efforts to afford Grantor with reasonable prior opportunity to review and comment upon all documents prepared by Grantee in connection with the EIS;

**(iii)**   EIS Insurance.

Grantee shall add Grantor, at no cost or expense to Grantor, as an additional insured on all insurance policies that Grantee is required to obtain in favor of the FAA pursuant to the FAA MOU;

**(iv)**   Spaceport Location.

Grantee shall cooperate and furnish full information to Grantor regarding the proposed Spaceport Project location, including proposed metes and bounds descriptions and survey maps, and shall actively consult with and solicit Grantor's comments and input regarding the proposed location.  However, Grantee shall have the exclusive right to select the final location of the Spaceport Project;

**(v)**   Spaceport Activities.

Grantee shall furnish Grantor in a timely manner with thorough documentation on the activities that will occur on the Spaceport Project property sufficient for Grantor to prepare the Conservation Easement.

**(vi)   Environmental Insurance.**

Grantee shall arrange for the Environmental Insurance Policy to be effective at Closing as described above; and

**(vii)   Cooperation   Provision/Subdivision/Environmental Covenant Revision.**

Grantee shall cooperate with and support Grantor's efforts to subdivide the Retained Land from the Property, to revise the Environmental Covenant as provided in this Agreement, and to resolve concerns stated in GA DNR's Technical Review Letter.

**B.**   Grantee shall have the right, by giving written notice thereof to Grantor, to terminate this Agreement at any time prior to the expiration of the Option Period.  One of the bases (but not the exclusive basis) for such termination may include the issuance of a Record of Decision or similar ruling by the FAA, the legal effect of which is to disapprove either the EIS specifically or the Spaceport Project generally.  Any termination shall be without further liability of one party to the other hereunder or otherwise, except for obligations that expressly survive by the terms hereof.  Except to the extent provided otherwise in Section 2(D), such termination shall not result in the return of the Option Price, which shall remain nonrefundable by Grantor.

5.   <u>OPTION RIGHTS AND OBLIGATIONS OF GRANTOR:</u>

Throughout the Option Period, and at all times prior to Closing:

**(i)**   Title/Rights.

Grantor shall retain all rights in, title to, and use of, the Site and the Property, including but not limited to, the free right of access to the Site

13

and the Property at all times for any and all purposes whatsoever, including the right to observe and be present for Grantee's work in connection with the EIS and otherwise; provided, however, that Grantor's presence, and that of its representatives, shall not be deemed to constitute approval of Grantee's activities, nor to create any liability whatsoever for Grantor in connection therewith (other than in the event of Grantor's gross negligence or willful misconduct);

 (ii) Advertisement.

Grantor shall not advertise the Property for sale;

 (iii) Conservation Easement.

Grantor shall have the right, but not the obligation, to burden the entirety of the Property, including but not limited to the Spaceport Area, with a Conservation Easement in favor of Grantor's preferred conservation organization, the terms of which will be negotiated with such organization by Grantor and Grantee diligently in a cooperative manner and in good faith so as to (i) further restrict the use of, and impose performance standards upon, the Property for conservation purposes such that the Property will fully qualify and conform to the requirements and procedures defined in Internal Revenue Code Section 170(h) for the benefit of Grantor, but at the same time (ii) allow for Grantee's access to and from the Property, and construction, operation, maintenance, and repair of, the Spaceport Project in the Spaceport Area on the Property for the benefit of Grantee;

 (iv) Subdivision/Environmental Covenant Revision.

  (a) No later than the earlier to occur of (1.) Grantee's having obtained FAA approval for the EIS for the Spaceport Project, and (2.) six (6) calendar months prior to the expiration of the Option Period, Grantor shall make reasonable commercial efforts to obtain a subdivision of the Site, with the assistance and cooperation of Grantee as provided above, in order to exclude the Retained Land from the Site; provided, however, that, if such subdivision cannot be obtained during the Option Period, then Grantor shall have no obligation to sell the Property to Grantee, and this Agreement shall automatically terminate upon the expiration of the Option Period, without further liability of either party to the other hereunder, by way of contract, tort, or otherwise at law or in equity; and

  (b) No later than the earlier to occur of (1.) Grantee's having obtained FAA approval for the EIS for the Spaceport Project, and (2.) six (6) calendar months prior to the expiration of the Option Period, Grantor shall make reasonable commercial efforts to obtain a revision of the existing Environmental Covenant relating to groundwater withdrawal, with the assistance and cooperation of Grantee as provided above, in order to authorize use of groundwater from the Site; provided, however, that, if such revision of the Environmental Covenant cannot be obtained during the Option Period, then Grantee may choose not to

purchase the Property, and this Agreement shall automatically terminate upon the expiration of the Option Period, without further liability of either party to the other hereunder by way of contract, tort, or otherwise at law or in equity; and.

(v)     Title Report/Survey.

Within ninety (90) days of the execution of this Agreement, Grantor shall order (a) a Title Commitment or Title Opinion, as the case may be, on the Property, together with copies of all exceptions (the "**Title Report**"), issued by a reputable national title insurance company to be selected by Grantor (the "**Escrow Agent**"), and (b) a survey conforming to the minimum standards for land title surveys in the State of Georgia (the "**Survey**").  Grantor shall share copies of the Title Report and the Survey with Grantee within thirty (30) days of receipt thereof. Grantor shall have no obligation to remove or satisfy any title exception, other than a financial obligation of the Property created solely by Grantor prior to Closing, or to bring any action or proceeding to remove any defect in or objection to title, or to fulfill any condition, nor shall Grantee have any right of action against Grantor therefor, at law or in equity, for damages or specific performance.  Notwithstanding the foregoing, Grantor shall cooperate in good faith with Grantee in support of Grantee's reasonable efforts to remove or clarify exceptions noted in the Title Report.

**6.     GRANTOR'S DISCLAIMER OF REPRESENTATIONS AND WARRANTIES:**

Grantor makes no representations, warranties or promises regarding the Property including, but not limited to, representations, warranties or promises as to the physical or environmental condition, layout, footage, leases, rents, income and revenues, expenses, zoning, operations, presence of munitions or hazardous substances, materials, or wastes, suitability for the Spaceport Project or otherwise for Grantee's use, or any other matter or thing affecting or relating to the Property. Property is bought and sold "AS IS."

**7.     MISCELLANEOUS:**

**A.**     This Agreement shall be construed in accordance with the laws of the State of Georgia notwithstanding any contrary "choice of laws" or "conflicts of laws" provisions of that or any other State.

**B.**     The titles and captions of paragraphs of this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit or describe the scope of this Agreement or the intent of any provisions thereof.

**C.**     The submission of this Agreement to Grantee shall not be construed to vest in Grantee any rights in, or reservation of, the Property whatsoever. Grantee shall have no right or interest hereunder until such time as

P.O. Box 99
200 East 4th Street
Woodbine, GA 31569

and cc:   Steve L. Howard, County Administrator
200 East 4th Street
Woodbine, GA  31569

and cc:   Amy L. Edwards, Esq.
Holland & Knight LLP
800 17th Street, NW
Suite 1100
Washington, DC  20006

**D.   All notices shall be effective when actually delivered.**

**9.   ASSIGNMENT OR OTHER TRANSFER:**

This Agreement shall not be assigned or otherwise transferred by Grantee to any entity, except with the express written prior consent of Grantor, which consent shall not be unreasonably withheld, conditioned or delayed by Grantor.  Any attempt to assign or otherwise transfer in the absence of such consent by Grantor shall be null, void, and of no effect.

**10.   AMENDMENT:**

This Agreement may not be amended except in writing by formal amendment fully executed by the respective duly authorized representatives of both parties.

**11.   DEFAULT/SOVEREIGN IMMUNITY:**

**A.**   In the event of a default or wrongful failure to Close by Grantee hereunder, which default remains uncured for a period of thirty (30) days after written notice thereof is given to Grantee, Grantor shall be entitled to retain the Option Price as liquidated damages for Grantee's failure to consummate the transaction contemplated by this Agreement.

**B.**   In the event of a default or wrongful failure to Close by Grantor hereunder, which default remains uncured for a period of thirty (30) days after written notice thereof is given to Grantor, Grantee shall be entitled, at its election, either (i) to a return of the Option Price as liquidated damages, or (ii) to bring an action for specific performance of this Agreement.

17

**C.**     Under no circumstances shall either party be liable for special, indirect, incidental, or consequential damages, no matter how incurred and whether foreseeable or unforeseeable.

**D.**     Nothing in this Agreement shall waive any claim of sovereign immunity available to Grantee.  Notwithstanding the foregoing, however, if the application of sovereign immunity would leave Grantor without a meaningful and adequate remedy for a breach or default by Grantee (or by a permitted assignee of Grantee), then in such case Grantor may terminate this Agreement and retain the Option Price as liquidated damages.

**12.**     **CONFIDENTIALITY:** Except as may be required by law, neither party shall disclose, release or disseminate in any way the contents of this Agreement to any other party (except to its employees, counsel, consultants, underwriters, and other agents and professionals), without the prior written consent of the other party.

**13.**     **ENTIRE AGREEMENT**:  This Agreement and its Exhibits contain all the representations by each party to the other and express the entire understanding between the parties with respect to the option for, and sale of, the Property.  All prior communications whether written or oral concerning the option for, and/or sale of, the Property are merged in or replaced by this Agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their respective representatives, thereunto duly authorized, as of the date and year first written above.

UNION CARBIDE CORPORATION,
a New York corporation, as "Grantor" hereunder

By: _____
Name: Edosa Obayagbona
Title: Authorized Representative

CAMDEN COUNTY,
a political subdivision of the State of Georgia, by and through the Camden County Board of Commissioners, as "Grantee" hereunder

By: _____
Name: James H. Starline
Title: Chairman

19

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their respective representatives, thereunto duly authorized, as of the date and year first written above.

> **UNION CARBIDE CORPORATION,**
> a New York corporation, as "Grantor" hereunder
>
> By: _____
> Name: Edosa Obayagbona
> Title: Authorized Representative
>
> *July 13, 2015*
>
> **CAMDEN COUNTY,**
> a political subdivision of the State of Georgia, by and through the Camden County Board of Commissioners, as "Grantee" hereunder
>
> By: _____
> Name: James H. Starline
> Title: Chairman

19

STATE OF MICHIGAN )
)
COUNTY OF MIDLAND)

Before me, a Notary Public in and for _________ County, personally appeared Edosa Obayagbona, the Authorized Representative of Union Carbide Corporation, who acknowledged the execution of the foregoing Purchase and Sale Agreement as "Grantor" thereunder.

Witness my hand and Notarial Seal this ____ day of __________, 2015.

______________________________
Notary Public
My commission expires: ____________

STATE OF GEORGIA )
)
COUNTY OF CAMDEN)

Before me, a Notary Public in and for Camden County, personally appeared James H Starling, the Chairman of Camden County, who acknowledged the execution of the foregoing Purchase and Sale Agreement as "Grantee" thereunder.

Witness my hand and Notarial Seal this 3 day of June, 2015.

THERESA J MILLER
Notary Public, Georgia
Camden County
My Commission Expires
July 16, 2018

Theresa J Miller
Notary Public
My commission expires: 7/16/18

STATE OF MICHIGAN )
                       )
COUNTY OF MIDLAND)

Before me, a Notary Public in and for _Midland_ County, personally appeared Edosa Obayagbona, the Authorized Representative of Union Carbide Corporation, who acknowledged the execution of the foregoing Purchase and Sale Agreement as "Grantor" thereunder.

Witness my hand and Notarial Seal this _13_ day of _July_, 2015.

_Melissa Zelno_
Notary Public
My commission expires: _04-08-2020_

**MELISSA ZELNO**
**Notary Public, State of Michigan**
**County of Bay**
**My Commission Expires 04-08-2020**
**Acting in the County of _Midland_**

STATE OF GEORGIA )
                      )
COUNTY OF CAMDEN)

Before me, a Notary Public in and for Camden County, personally appeared_____, the _____ of Camden County, who acknowledged the execution of the foregoing Purchase and Sale Agreement as "Grantee" thereunder.

Witness my hand and Notarial Seal this ____ day of _____, 2015.

_____
Notary Public
My commission expires: _____

20