### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF GEORGIA
### BRUNSWICK DIVISION

| | |
|---|---|
| CAMDEN COUNTY, a political subdivision of the State of Georgia, by and through the Camden County Board of Commissioners,<br><br>     Plaintiff,<br><br>v.<br><br>UNION CARBIDE CORP.,<br><br>     Defendant. | CIVIL ACTION FILE<br><br>NO.: 2:22-CV-00077-LGW-BWC |

### PLAINTIFF'S RESPONSE IN OPPOSITION
### TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT

Plaintiff Camden County ("Plaintiff" or the "County") files this response in opposition to the Motion to Dismiss First Amended Complaint by Defendant Union Carbide Corporation ("Defendant" or "Union Carbide").  (Doc. [67].)  Union Carbide failed to show—as a matter of law—that it is entitled to pocket **$2,640,000** of public funds, which were paid by the County pursuant to authority that has since been "repealed" by voter referendum.  To the contrary, Georgia law allows a public entity to recover funds paid pursuant to a void contract.  Because it is for the trier of fact to weigh the equities and determine whether Union Carbide has been unjustly enriched, the Motion to Dismiss should be denied.

## I.   **OVERVIEW**

During the pendency of this case, the Georgia Supreme Court issued its Opinion in *Camden County v. Sweatt*, 315 Ga. 498 (2023), which upheld the constitutionality of the March 8, 2022, referendum that repealed the resolutions authorizing the Option Contract between the County and Union Carbide.  With the Option Contract rendered void, the sole issue before this Court is the proper disposition of $2,640,000 in public funds paid by the County to Union Carbide pursuant to the voided contract.

As reflected in the First Amended Complaint, the County has stated two viable theories to recoup—in whole or in part—the amount of $2,640,000 paid to Union Carbide.  First, as a matter of Georgia law, where public funds are paid without authorization, "it is proper for the county to bring a suit for the recovery of same." *Howard v. Brantley County*, 260 Ga. App. 330, 332 (2003) (citing *Burke v. Wheeler County*, 54 Ga. App. 81 (1936)).  Because the referendum repealed the resolutions authorizing the Option Contract, the payments by the County to Union Carbide lacked authorization, thereby entitling the County to recover $2,640,000 in public funds as a matter of law.  Second, even if the payments to Union Carbide were properly authorized, the County has not received the bargained-for benefits of the Option Contract, for which it paid Union Carbide the amount of $2,640,000.  It

would be inequitable and unjust to allow Union Carbide to retain funds paid

pursuant to a voided contract, under which Union Carbide has not performed (and

is no longer required to perform) its remaining contractual obligations.

In its motion, Union Carbide argues that the Court should dismiss the First

Amended Complaint and leave the parties as they are.  Union Carbide's brief,

however, is devoid of any legal authority that entitles it to retain—as a matter of

law—the amount of $2,640,000 in public funds for doing ***nothing*** other than

keeping the Property "off the market" for almost seven years.  According to Union

Carbide, it is entitled to keep the $2,640,000 payment, even though it is no longer

required to sell the Property to the County at the agreed-upon price, honor the

$2,115,000 credit to which the County would have been entitled, and is otherwise

excused from its remaining contractual obligations.  Under the scenario proposed

by Union Carbide, Union Carbide gets to keep the Property ***and*** $2,640,000 in

taxpayer dollars, while the County is left holding the proverbial bag.  This is the

very definition of unjust enrichment, where one has received money under such

circumstances that in equity and good conscience he ought not retain.

Assuming the factual allegations in the First Amended Complaint to be true,

as required at this early pleading stage, the County has stated a claim to recover in

whole or in part the amount of $2,640,000 from Union Carbide under alternate

theories of unjust enrichment and/or money had and received.  In the event the Court does not allow the County to recover the full amount as a matter of law under the holdings of *Howard* and *Burke*, discovery will be necessary to determine whether Union Carbide has been unjustly enriched, such that it should return the $2,640,000 payment to the County, in full or in part.  Because the weighing of equities is not proper for resolution on a motion to dismiss, Union Carbide's motion should be denied.

## II.   <u>SUMMARY OF ALLEGATIONS</u>

### A.   <u>The County Board of Commissioners Pass Resolutions that Authorize the Option Contract with Union Carbide.</u>

On June 3, 2015, the Camden County Board of Commissioners approved a resolution authorizing the County to enter into an option agreement with Union Carbide Corporation for the purchase of the Property on which the proposed Spaceport Project was to be located (the "Initial Resolution").  (First Am. Compl. ¶ 4.)  As authorized by the Initial Resolution, the Parties subsequently executed the contemplated contract (the "Option Contract") pursuant to which the County paid Union Carbide the sum of $960,000 for the exclusive right—for an initial option period of two years—to purchase the Property for the total agreed upon price of $4,800,000.  (*Id*. ¶ 5.)  In the years following the Initial Resolution, the Board of Commissioners adopted an additional four resolutions (with the Initial Resolution,

the "Resolutions") that authorized amendments by which the option period for the County to purchase the Property was extended through April 23, 2022.  (*Id*. ¶ 6.) In total, the County paid to Union Carbide the amount of **$2,640,000** pursuant to the terms of the Option Contract and subsequent amendments, as authorized by the Resolutions.  (*Id*. ¶ 7.)

In consideration of the County's payment of $2,640,000 to Union Carbide, the County received the right to purchase the Property from Union Carbide and to receive a credit in the amount $2,115,000 toward the purchase price.  (*Id*. ¶ 8.)  The Option Contract also included several conditions that Union Carbide was required to meet prior to the closing of the purchase of the Property, which were intended to benefit the County.  For example, Union Carbide was required to make reasonable commercial efforts to (i) subdivide the site to exclude a hazardous waste landfill and groundwater treatment system; (ii) obtain a revision of the existing environmental covenant to authorize use of groundwater from the site; and (iii) substantially resolve the concerns raised in a 2015 review letter from the Georgia Department of Natural Resources.  (*Id*. ¶ 9.)

**B.**     **The March 8, 2022, Referendum "Repeals" the Resolutions That Authorized the Option Contract.**

On December 20, 2021, the Spaceport Project was about to enter the next stage of its development when the FAA issued the County a Commercial Space

Transportation License.  (*Id*. ¶ 10.)  Only a week prior, however, on or about December 14, 2021, two residents of Camden County filed a petition in the Camden County Probate Court seeking a referendum election that would repeal the Resolutions that authorized the Option Contract years ago.  (*Id*. ¶ 11.)

The Probate Court sanctioned the petition and called for a special election to be held on March 8, 2022 (the "Referendum") on the following question:

> Shall the resolutions of the Board of Commissioners of Camden County, Georgia authorizing the Option Contract with Union Carbide Corporation and Camden County's right and option to purchase the property described therein be repealed.

(*Id*. ¶ 12.)  By its express terms, the Referendum—if approved by the Camden County electorate—would "repeal" the underlying Resolutions that authorized the Option Contract in the first instance, thereby rendering it void *ab initio*.  (*Id*.)

In response, the County filed a petition for a writ of prohibition and other relief in the Superior Court of Camden County, alleging that the Probate Court exceeded its jurisdiction on the basis that Art. IX, Sec. II, Par. I (b) (2) of the Georgia Constitution (the "Home Rule Paragraph") does not authorize a referendum election to repeal the Resolutions passed by the Board of Commissioners.  (*Id*. ¶ 13.)  On March 4, 2022, the Superior Court denied Camden

County's petition and allowed the Referendum to go forward.  (*Id*. ¶ 14.)  On March 8, 2022, the Referendum passed by a vote of 4,169 in favor to 1,613 opposed with less than 17% of registered voters participating.  (*Id*. ¶ 15.)  That same day, the County appealed the Superior Court's decision.  (*Id*. ¶¶ 16, 17.)

**C.**  **The County Commences Legal Action After Union Carbide Repudiates the Option Contract.**

After the Referendum passed, the County sought Union Carbide's cooperation to ensure that its contractual rights and taxpayer money were protected while the Referendum's legality was addressed by the Georgia Supreme Court. (*Id*. ¶ 18.)  Through multiple correspondence, as set forth more fully in the original Complaint (*see* Doc. [53-1] at ¶¶ 41-49, Exs. F-I), it became apparent that Union Carbide intended to repudiate the Agreement and at the same time pocket the payments made by the County.  (*Id*. ¶ 19.)  To preserve the County's rights and protect taxpayer money, the County filed the present lawsuit in Camden County Superior Court on July 27, 2022.  (*Id*. ¶ 20.)

At the time of its initial filing, this lawsuit included claims for breach of contract, because the Georgia Supreme Court had not yet ruled on the legality of the Referendum, as well as a claim to recover the monies paid by the County to Union Carbide in the event the Georgia Supreme Court allowed the Referendum to stand.  (*Id*. ¶ 21; Doc. [1-1].)  On September 27, 2022, Union Carbide filed a

motion to dismiss the Complaint, which the parties fully briefed and argued on January 17, 2023.  (*Id*. ¶ 22.)

**D.**    **The Georgia Supreme Court Upholds the Referendum that Voided the Option Contract.**

While the motion to dismiss the Complaint was pending, on February 7, 2023, the Georgia Supreme Court issued its decision on the constitutionality of the Referendum.  (*Id*. ¶ 23; Doc. [54-1].)  After considering the text, the Georgia Supreme Court held that the Home Rule Paragraph "authorized the County's electorate to petition for the repeal of the Resolutions."  (*Id*. ¶ 25; Doc. [54-1] at 30.)  Therefore, under the holding of the Georgia Supreme Court, the Resolutions that authorized the Option Contract with Union Carbide stand repealed.  (*Id*. ¶ 26.)

Following the decision of the Georgia Supreme Court, the County made a formal demand, through counsel, for Union Carbide to return $2,640,000 of taxpayer dollars, which as a result of the Referendum was paid to Union Carbide without authority and pursuant to a void contract.  (*Id*. ¶ 29.)  Union Carbide refused the demand.  (*Id*.)

**III.**    **ARGUMENT AND CITATION TO AUTHORITIES**

**A.**    **Standard on a Motion to Dismiss.**

At the pleadings stage, the Federal Rules of Civil Procedure only require "a short and plain statement of the claim showing that the pleader is entitled to relief."

Fed. R. Civ. P. 8(a)(2).  In deciding whether a complaint states a claim for relief, the Court must accept the facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1347 (11th Cir. 2016).  A complaint can survive a motion to dismiss if it "contain[s] either direct or inferential allegations respecting all material elements necessary to sustain a recovery under some viable legal theory." *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282-83 (11th Cir. 2007) (internal quotation marks and citations omitted).

**B.**     **The County Has Stated Viable Legal Theories for Recovery from Union Carbide.**

   **1.**     **As a Matter of Law, the County Is Entitled to Recover Public Funds Paid to Union Carbide Without Authorization and Pursuant to a Void Contract.**

There exists no legal authorization for the County's payment of $2.64 million of public funds to Union Carbide, which the County is entitled to recover as a matter of law.  As a result of the Referendum—and as affirmed by the Georgia Supreme Court—the Resolutions passed by the Board of Commissioners of Camden "authorizing" the Option Contract with Union Carbide stand "repealed." *Camden Cnty. v. Sweatt*, 315 Ga. 498, 511 (2023).  Where public funds are paid illegally without authorization, "it is proper for the county to bring a

suit for the recovery of same." *Howard v. Brantley County*, 260 Ga. App. 330, 332

(2003) (citing *Burke v. Wheeler County*, 54 Ga. App. 81 (1936)).

In the *Howard* case, the county brought an action for money had and

received against a painting contractor to recover $190,600 paid towards road

striping for county roads. *Howard*, 260 Ga. App. at 330.  To "authorize" payment

of invoices submitted by the contractor, the board of commissioners in a 3-2 vote

amended the county budget to transfer the funds.  *Id*. at 331.  In affirming the trial

court's grant of summary judgment in favor of the county, the Georgia Court of

Appeals recognized the general rule allowing for recovery of public funds

"illegally paid" as in the case where "the contract in issue . . . was ultra vires as

beyond the legal authority of the county to enter." *Id*. at 332.  Because the instant

contract was "illegal as beyond [the county's] authority," the county was entitled

as a matter of law to recover funds illegally paid to the contractor, even where the

contractor had already provided the services for which the county was invoiced.

*Id*. at 330-332.

Similarly, in the *Burke* case, the Georgia Court of Appeals allowed the

county to recover $1,150 paid to an accountant, finding that this was "an illegal

payment . . . to which plaintiff was not entitled, and which the county board of

education had no right or authority to pay to plaintiff."  *Burke*, 187 S.E.2d at 248.

In so holding, the Georgia Court of Appeals reasoned as follows:

> Public funds cannot be expended unless such expenditure
> is authorized by law . . . .  The fact that this money was
> paid by the county board of education under an illegal and
> unauthorized contract would not estop or prevent the
> proper authorities of the county from bringing a suit for
> the recovery of the same. . . .  If the thing done is illegal or
> not warranted by the law, however beneficial it may be,
> the public is not estopped to deny its validity. . . .  Where
> public funds are illegally paid out by county officials or by
> some agency of the county, it is proper for the county to
> bring a suit for the recovery of same.

*Id*. at 249.  As in the *Howard* case, the Georgia Court of Appeals in the *Burke* case

allowed the County to recover illegally paid funds, even where the county received

and benefited from the contracted services.

The *Howard* and *Burke* cases are controlling.  As alleged in the First

Amended Complaint (and undisputed by Union Carbide), the authority of the

Board of Commissioners to approve the Option Contract derived from the

Resolutions passed on June 3, 2015, and upon the subsequent amendments that

extended the option period.  It was these Resolutions that were "repealed" by the

Referendum on March 8, 2022.  Upon "repeal" of the Resolutions, the Option

Contract was no longer authorized.  As such, the $2.64 million in public funds paid

by the County to Union Carbide were pursuant to an "illegal and unauthorized

contract," which "would not estop or prevent [Camden County] from bringing suit for the recovery of same." *Burke*, 187 S.E.2d at 249. As in the *Howard* and the *Burke* cases, Union Carbide's assertion that it "performed" by keeping the Property off the market for almost seven years has no relevance, as the Option Contract was void and lacking authorization. *See also City of Baldwin v. Woodard & Curran, Inc.*, 293 Ga. 19, 28 (2013) (payment under an equitable doctrine not allowed where contract is void, even though party seeking payment has performed its part of the bargain and relied upon the contract to its detriment).

Union Carbide's attempts to distinguish *Howard* and *Burke* are unavailing. Where the Resolutions stand "repealed," Union Carbide is unable to cite to any other statute, rule, or ordinance, that would authorize the County's payment of $2.64 million of public funds to Union Carbide. No such authorization exists. Indeed, in its brief, Union Carbide argues only that *Howard* and *Burke* do not apply because in this case the payment was authorized "when they were made" by the County in 2015 and in subsequent years, prior to the Referendum. (Doc. [67] at 9-10.) Contrary to Union Carbide's argument, the Referendum did not effect only a partial repeal of the Resolutions, such that the Option Contract remained "authorized" (hence, valid and enforceable) prior to that date. Nor did the Referendum terminate an otherwise valid contract. Instead, as reflected by the

plain language of the Referendum, the Resolutions "authorizing" the Option Contract were "repealed" in absolute terms without temporal qualification, thereby rendering the contract void in its entirety since inception. (First Am. Compl. ¶ 12.)

Unable to avoid the plain text of the Referendum, Union Carbide resorts to hypothetical scenarios to demonstrate the "absurdity" of allowing the county electorate to repeal resolutions authorizing a contract that the parties have partially performed.  (Doc. [67] at 10.)  The "absurdity" of the result, however, is not for this Court to decide.  In affirming the constitutionality of the Referendum, the Georgia Supreme Court held that "the Home Rule Paragraph authorized the County's electorate to petition for the repeal of the Resolutions," without regard for the fact that the Option Contract had been in place for nearly seven years. *Sweatt*, 315 Ga. at 511.  Furthermore, the result complained of by Union Carbide is not more "absurd" than Union Carbide's suggested alternate outcome, where the County loses the entirety of $2.64 million in public funds (plus additional millions the County had invested in the Spaceport Project) without receiving a corresponding benefit.

If Union Carbide desired to protect its contractual rights, it had the ability to challenge the legality of the Referendum.  Rather than challenge the Referendum, Union Carbide repeatedly took the position (including before this Court) that the

Referendum was legal.  (*See, e.g.*, [Doc. 18] at 2, 7, 14; [Doc. 34] at 5, 6.)  The Georgia Supreme Court having now affirmed the legality of the Referendum, Union Carbide can no longer dispute that the underlying authorization for the Option Contract has been repealed, thereby voiding the Option Contract and allowing the County to recoup the $2.64 million paid to Union Carbide under the holdings of *Howard* and *Burke*.[1]  *See also Sentinel Offender SVCS., LLC v. Glover*, 296 Ga. 315, 333 (2014) ("Just as equity would not be available . . . in recovering payment . . . under the void contract, equity will not protect [a party] from having to disgorge that which it unlawfully received.").

## 2.   The County Has Stated a Claim for Unjust Enrichment and Money Had and Received.

### a.   There Exists No Enforceable Contract.

In the alternative, even if the Court finds that the payments by the County were "authorized" at the time they were made to Union Carbide, the County has stated a claim for unjust enrichment and/or money had and received because there is currently no Option Contract to enforce.  Union Carbide's argument that the Option Contract remains enforceable for the period prior to March 8, 2022 (Doc.

---

[1] In its prior brief, Union Carbide even recognized that taxpayers could seek a writ of mandamus "to compel a board of commissioners to file suit to recover amounts of county funds dispersed without legal authorization."  (Doc. [18] at 18 (citing to *Nelson v. Wainwright*, 224 Ga. 693, 694 (1994)).

[67]) at 16-17 n.16) is contrary to the plain text of the Referendum passed by the electorate, which as discussed above was an absolute repeal of the underlying authorization for the Option Contract and not a partial repeal with temporal limitations.  In the absence of an enforceable written contract,[2] the County has stated a claim for unjust enrichment (or money had and received).

  **b.  <u>The Allegations Support the Finding that Union Carbide Has Been Unjustly Enriched and Cannot in Good Conscience Retain Public Funds.</u>**

Under Georgia law, "the theory of unjust enrichment applies when there is no contract and when there has been a benefit conferred which would result in an unjust enrichment unless compensated."  *Clark v. Aaron's, Inc*., 914 F. Supp. 2d 1301, 1309 (N.D.Ga. 2012) (internal quotation marks and citations omitted); *see also Wachovia Ins. Servs., Inc. v. Fallon*, 299 Ga. App. 440, 449 (2009) ("[A] claim for unjust enrichment is not a tort, but an alternative theory of recovery if a contract claim fails.")  The "essential elements of the claim are that (1) a benefit has been conferred, (2) compensation has not been given for receipt of the benefit, and (3) the failure to so compensate would be unjust."  *Clark*, 914 F. Supp. 2d at

---

[2] Union Carbide also previously argued before this Court that the Option Contract is "unenforceable" due to non-compliance with O.C.G.A. § 36-10-1, which requires all county contracts to be in writing and entered on the minutes.  (Doc. [18] at 12 and [47] at 4-5.)

1309; *see also Chartis Ins. Co. of Canada v. Freeman*, No. CV 111-193, 2013 WL 12121864, at \*6 (S.D. Ga. Mar. 18, 2013) (same).

Under Georgia law, "an action for money had and received is merely one form of action to recover damages based on unjust enrichment." *Bolinger v. First Multiple Listing Serv., Inc.*, 838 F. Supp. 2d 1340, 1366 (N.D. Ga. 2012) (citing *Nat'l City Bank of Rome v. Busbin*, 175 Ga. App. 103 (1985)). "An action for money had and received is founded upon the equitable principle that no one ought to unjustly enrich himself at the expense of another, and is maintainable . . . where one has received money under such circumstances that in equity and good conscience he ought not to retain it." *Sentinel Offender Servs., LLC v. Glover*, 296 Ga. 315, 331 (2014). In order to sustain an action for money had and received, a party must show, in addition to showing that the person received money "justly" belonging to another, that it made a demand for payment and was refused. *Fernandez. v. WebSingularity, Inc*., 299 Ga. App. 11, 13 (2009).

The factual allegations in the First Amended Complaint state a claim for unjust enrichment and/or money had and received under Georgia law. The County made option payments to Union Carbide totaling $2.64 million, but the County did not receive the bargained-for consideration for those payments. Although the County paid $2.64 million for option rights as set forth in the Option Contract, the

County never received the benefit of the option right or the opportunity to purchase the Property.  Union Carbide's assertion that the County "elected ***not*** to purchase the Property" is false and belied by the allegations in the First Amended Complaint.  (Doc. [67] at 19) (emphasis in original).  The County, in fact, attempted to exercise its option rights and filed this lawsuit to obtain Union Carbide's specific performance.  (Doc. [53-1] at ¶¶ 51-62.)  As a result of the Referendum, however, the County's authority to enter into the Option Contract and exercise its "right and option to purchase the property described therein" were "repealed."  (First Am. Compl. ¶ 12.)  With the Option Contract invalidated, the County never received the benefit of its $2.64 million payment to Union Carbide.

Furthermore, the County never received the benefit of the bargained-for credit in the amount of $2,115,000 that would be applied towards the purchase of the Property at the time of closing.  (First Am. Compl. ¶ 8; Doc. [67-6] § 4 ("For purpose and clarity, the parties acknowledge and agree that the total credit in the amount of Two Million One Hundred Fifteen Thousand Dollars and No Cents ($2,115,000) remain available as a credit against the Purchase Price of the Property to be taken at Closing.").)  While the credit is not a refund, the County would have received the benefit of this credit—which would have offset a significant portion

of the option payments—had the Option Contract not been invalidated by the Referendum.

In its efforts to unjustly retain the option payments, Union Carbide argues that the County "agreed" that the option payments were "non-refundable" at the time they were made.  (Doc. [67] at 16 n.5.)  This is false.  In addition to the credit provision discussed above, the Option Contract also included explicit refund provisions under which the option payments would be refundable if Union Carbide were "unsuccessful" in (i) "substantially resolving" certain environmental issues, or (ii) subdividing the site.  (Doc. [67-1] at 5.)  As alleged in the First Amended Complaint, Union Carbide failed to perform either of these tasks, which would have entitled the County to a refund.  (First Am. Compl. ¶¶ 39-41.)  Union Carbide's refusal to provide a refund under these circumstances unjustly enriches Union Carbide.

Therefore, Union Carbide has not shown, as a matter of law, that it is justified in pocketing the entirety of the $2.64 million payment simply because it kept the Property off the market for nearly seven years.[3]  (Doc. [67] at 1 and 18.)

---

[3] In fact, discovery may show that Union Carbide profited by holding the Property for seven years, or that Union Carbide had no intention of selling the Property during that time period.

The question of whether Union Carbide has been unjustly enriched by its retention of $2.64 million in public funds (or, conversely, whether the County has received the benefit of its payment of $2.64 million) is not appropriate for resolution at the pleadings stage.

## C.   The Pleadings Do Not Conclusively Establish Defendant's Affirmative Defenses.

At the pleadings stage, the County does not bear the burden of "disproving" Union Carbide's affirmative defenses in order to state a claim. *Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP*, 609 F. App'x 972, 978 (11th Cir. 2015) ("Plaintiff's complaint need not anticipate and counter affirmative defenses.")  An affirmative defense can justify dismissal of a complaint "only if the complaint shows on its face that the defense applies." *Id*.

### 1.  The Voluntary Payment Doctrine Does Not Bar the County's Claim.

The voluntary payment doctrine, O.C.G.A. § 13-1-13, has no applicability in this case.  As an initial matter, the payments at issue in this case were not "made through ignorance of the law" or "where all the facts were known."  O.C.G.A. § 13-1-13.  The allegations in the First Amended Complaint do not show that the County knew or should have known at the time the option payments were made to Union Carbide that the Resolutions authorizing the Option Contract would be repealed ***years later*** by the electorate based on an unprecedented construction of

the Home Rule Paragraph.  Because the County is not seeking to undo a payment made to Union Carbide on grounds that it was paid by mistake or due to misunderstanding, the voluntary payment doctrine has no applicability.

As set forth in the First Amended Complaint, the County is seeking to recover public funds paid to Union Carbide without authorization pursuant to a void contract.  Under these circumstances, Georgia law is well settled that the voluntary payment does not preclude recovery of such payments:

> A wrongful payment made by a public officer is not a voluntary payment in so far as the public corporation is concerned.  If the thing done is illegal or not warranted by the law, however beneficial it may be, the public is not estopped from denying its validity.  The ordinary rule governing rule governing individuals that, when a contract is illegal or against public policy, the law will leave the parties where it finds them, does not apply where the public is one of the parties.

*Burke*, 187 S.E.2d at 249.  Even where the plaintiff is not a public entity, the voluntary payment doctrine does not bar recovery of payments made pursuant to a void contract.  *See*, *e.g.*, *Williams v. Bell*, 126 Ga. App. 432 (1972) ("Money paid under an invalid contract may be recovered in an action for money had and received.").

The cases cited by Union Carbide do not hold otherwise.  In *Montgomery County v. Sharpe*, 261 Ga. App. 389 (2003), the Georgia Court of Appeals

affirmed the trial court's ruling that the payments by the county to the tax commissioner were voluntary and could not be recovered.  In so holding, however, the Georgia Court of Appeals noted that the tax commissioner "legally collected the tag fees" and was "legally entitled to compensation." *Id.* at 392.  The *Montgomery* opinion also cited to *Burke* with approval and distinguished the "present situation" as "not involve[ing] . . . the county's attempt to recover funds paid pursuant to a void contract." *Id.*  at 391.  Because this case, unlike *Montgomery*, does involve the County's attempt to recover payments to Union Carbide pursuant to a void contract, *Burke* is controlling.  None of the remaining cases cited by Union Carbide discuss application of the voluntary payment doctrine against a public entity in the context of a void contract and therefore are inapposite.

The Georgia Supreme Court has also recognized that the voluntary payment doctrine under O.C.G.A. § 13-1-13 must be construed in harmony with a claim for money had and received under O.C.G.A. § 23-2-32(b), which provides that "[r]elief may be granted even in cases of negligence by the complainant if it appears that the other party has not been prejudiced thereby." *Gulf Life Ins. Co. v. Folsom*, 256 Ga. 400, 402 (1986).  In harmonizing these two statutes, the Georgia Supreme Court held that, "in an action for money had and received, the plaintiff generally can recover a payment mistakenly made when that mistake was caused

by his lack of diligence or his negligence in ascertaining the true facts and the other party would not be prejudiced by refunding the payment—subject to a weighing of the equities between the parties *by the trier of fact*." *Id*. at 406 (emphasis added).

Therefore, to the extent the voluntary payment doctrine even applies, the County's claim for money had and received cannot be resolved on a motion to dismiss and instead must be decided "by the trier of fact," who may determine that Union Carbide will suffer no prejudice by returning $2.64 million in whole or in part to the County. *Folsom*, 256 Ga. at 406. This is not a rare case where the existence of prejudice to Union Carbide can be decided as a matter of law on a motion to dismiss. There are no facts in the First Amended Complaint suggesting that payment of $2,640,000 to Union Carbide is fair compensation simply for keeping the Property off the market for nearly seven years. In fact, the allegations support the opposite conclusion.[4] (Doc. [58] at ¶ 9, 37-43, 46.) Accordingly, the voluntary payment doctrine does not preclude the County's claim for unjust enrichment and/or money had and received as a matter of law.

---

[4] Furthermore, given Union Carbide's position that the Option Contract failed to comply with the requirements of O.C.G.A. § 36-10-1 and therefore invalid, *see* note 2, *supra*, there can be no prejudice to Union Carbide if required to return the funds to the County.

2.  **The Alleged Constitutional Violation Is Not a Proper Defense to the County's Claims.**

The Referendum by its express terms "repealed" the Resolutions passed by the Board of County Commissioners that authorized the Option Contract with Union Carbide *nearly seven years ago*.  On its face, therefore, the Referendum was retroactive in its effect by repealing Resolutions that were passed years ago.  As recognized by the Georgia Supreme Court, the Referendum grew out of "citizen opposition to the project."  *Camden County v. Sweatt*, 315 Ga. 498, 499 (2023).  The very purpose of the Referendum was to impair the legality of Option Contract by repealing its underlying authorization since inception.  There is no fair reading of the Referendum other than allowing for retroactive invalidation of the Option Contract, rendering it void *ab initio*.[5]

If Union Carbide were serious in its position that the Georgia Constitution prohibits the retroactive impairment of its contractual rights under the Option Contract, it could have filed a lawsuit seeking declaratory relief, like the faculty

_____

[5] Union Carbide previously acknowledged the retroactive effect of the Referendum in its prior correspondence with the County and briefs filed with this Court, in which Union Carbide took the position that the Referendum effected a "rescission" of the Option Contract.  (Doc. [18] at 17, [53-8].)  The "ultimate goal" of rescission is "to return the parties as nearly as possible to the status quo ante" and therefore is necessarily retroactive in effect.  *Kobatake v. E.I. DuPont De Nemours & Co.*, 162 F.3d 619, 627 (11th Cir. 1998).

members in *Busbee v. Georgia Conference*, 235 Ga. 752 (1975), the case relied upon by Union Carbide in its brief.  (Doc. [67] at 12-14.)  Union Carbide, however, did not raise any legal challenge to the Referendum and instead relied on its legality in refusing to perform its contractual obligations when the County demanded specific performance.  The Georgia Supreme Court having now affirmed the constitutionality of the Referendum, Union Carbide is foreclosed from raising a constitutional challenge in this case.

Even if the Court were to agree that the Georgia Constitution prevents the Referendum from retroactively voiding the Option Contract, the *Busbee* case does not entitle Union Carbide to retain the $2.64 million from the County ***while refusing to perform its remaining obligations under the Option Contract***.  To use the *Busbee* case as an example, there is nothing in the opinion to suggest that the faculty members could retain their increased salaries under their employment contracts while refusing to perform their teaching duties.  For the same reason, the Option Contract is either valid or invalid in its entirety, and the effect of the Referendum—retroactive or otherwise—applies to the Option Contract as a whole. Union Carbide cannot retain the benefits of the Option Contract while simultaneously absolving itself of contractual obligations.  Georgia law does not allow Union Carbide to pick and choose those terms of the Option Contract it

seeks to enforce as valid and unimpaired by the Referendum.  Union Carbide's

arguments to the contrary only further highlight Union Carbide's efforts to unjustly

enrich itself at the expense of the County and its taxpayers.

### IV.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court deny

Defendant's Motion to Dismiss.

Respectfully submitted this 15th day of May, 2023.

<u>*/s/ Jeremy U. Littlefield*</u>
Richard L. Robbins
Georgia Bar No. 608030
rrobbins@robbinsfirm.com
Jeremy U. Littlefield (PHV)
Georgia Bar No. 141539
jlittlefield@robbinsfirm.com
Robbins Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
Telephone: (678) 701-9381
Facsimile: (404) 856-3255

John S. Myers
Georgia Bar No. 533150
John S. Myers, P.C.,
200 East Fourth Street, P.O. Box 99
Woodbine, Georgia 31569
Phone (912) 510-8400
countyattorney@co.camden.ga.us

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this day I have served the foregoing **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT** on all parties by electronically filing it with the Clerk of the Court using the Court's electronic filing system.

This 15th day of May 2023.


_/s/ Jeremy U. Littlefield_
Jeremy U. Littlefield